[Crim. No. 4756. In Bank. Mar. 21, 1947.]

THE PEOPLE, Respondent, v. HOWARD HERBERT CHESSER, Appellant.

Leo R. Friedman for Appellant, under appointment by the Supreme Court.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

GIBSON, C. J.—This appeal was taken automatically under the provisions of section 1239 of the Penal Code from a judgment imposing the death penalty.

Defendant and his wife were charged with the murder of their infant daughter in a complaint filed by the district attorney of Merced County. On the morning of September 30, 1946, defendant appeared before a committing magistrate without counsel. At the request of the district attorney, an attorney practicing in Merced consented to appear for defendant "solely for the purpose of waiving the preliminary examination." The attorney making the appearance was not acquainted with defendant, knew nothing about the case, and did not discuss the facts with defendant or undertake to advise him as to what course he should pursue. Defendant was informed by the attorney concerning the purpose of the hearing and the effect of a waiver, and thereupon, at the request of defendant, the attorney waived a preliminary hearing in his behalf.

At 11 o'clock on the same morning defendant was arraigned before the superior court without counsel. The information was read to him and he was informed by the court that he was entitled to a jury trial, to a lawyer to represent him, and to the process of the court to bring any witnesses he wanted. In response to inquiries by the court, the defendant stated he did not want a lawyer or a jury trial and that he was ready to enter his plea. The court asked the defendant if he had talked to any lawyer relative to the case, and defendant replied that he had not. The court then expressed a doubt as to "whether or not we should proceed in this matter without appointing a lawyer in view of the seriousness of this charge." The district attorney said that the appointment of counsel was not required if the defendant waived his right in open court, but that there would be no objection to such an appointment if the court felt "in view of the nature of this charge," that it should be made. He added: "However, I think the defendant has been fully apprised of his rights here and he knows the nature of the charge. . . ." Whereupon the following occurred:

"THE COURT: You understand there is a possibility of the death penalty being invoked in this charge?

THE DEFENDANT: Yes, sir.

THE COURT: I will take your plea at this time. What is your plea to this Information, guilty or not guilty?

THE DEFENDANT: Guilty, your Honor.''

The matter was continued until 2 o'clock of the same day for the purpose of taking evidence to determine the degree of the offense.

Mrs. Chesser testified at the hearing that in August, 1944, she was living with her husband on a ranch where he was employed by Mr. and Mrs. Court as a farm hand. On the afternoon of August 7, defendant and his wife went to a nearby town with their ten months' old daughter to get some groceries. Defendant "started drinking" while in town and brought some beer home with him. Upon arriving home Mrs. Chesser put the baby in a crib in the bedroom and went into the kitchen to prepare some food. She heard a sound as if the baby were choking, and returning to the bedroom she saw defendant "holding the baby up" and "he had his fingers in the baby's mouth." He put the baby back in the crib and told his wife he would kill her if she told anyone what he had done. Later in the evening she asked Mrs. Court to come in to see the baby. There was blood on the child's mouth and its rectum was bruised. The baby died during the night and the next morning defendant hid the body in some weeds near the river. They left shortly afterward for Colorado. Mrs. Chesser was asked if defendant had ever told her "that he might kill that baby or threaten it." She answered, "Yes sir, he didn't like the baby."

Mrs. Court testified that about 5 o'clock on the evening of August 7, 1944, Mrs. Chesser said that her husband was being mean to her baby but not to tell him she had mentioned it. A few minutes later, under the pretext of returning some clothespins, Mrs. Court went to the Chesser house and examined the baby. It appeared to be restless and its mouth was bruised and its rectum was red. Defendant told Mrs. Court that the baby was sick and had been crying and he had "paddled" her but that he had not hurt her. Later in the evening Mrs. Court, looking in the bedroom window, saw defendant with the baby on his lap and he was trying to feed her some liquid with a spoon from a cup which Mrs. Chesser was holding.

John Lattorraca, undersheriff of Merced County, testified that, accompanied by defendant, he went to the place where defendant said he had hidden the child's body. The witness did not find the body, but he found part of the blanket in

which it had been wrapped, and the can in which it had been placed by defendant.

The defendant did not ask any questions of the witnesses or take the stand in his own behalf although he was informed by the court of his right to do so. When he was asked if he wished to testify he replied, ''There is nothing I would like to say, your Honor, except I would like to be punished to the full extent. I don't feel that the President of the United States would want me to live for what I have done, or even the people, and I would like to be sent to the gas chamber and executed and give justice as I gave unjustice.''

The district attorney suggested to the court that he thought ''it would be proper at this time to make an order that the defendant be examined under section 1368 of the Penal Code in order that the Court may determine that issue.'' It was ordered that the defendant ''be examined by two expert witnesses on the question of sanity,'' and the hearing was set for Tuesday, October 1, 1946.

The doctors appointed by the court testified that they had examined defendant for more than an hour and that it was their opinion that he was presently sane and ''probably was sane at the time in 1944 . . . of this alleged crime.'' Defendant told the doctors that he was in the Army from 1941 to 1943, and that while in the service he spent much of his time in the guardhouse for absences without leave and drinking. Defendant was discharged from the Army at Torney General Hospital where he had undergone observation in a ''lock ward.'' One of the doctors testified that when questioned concerning the cause of the baby's death, defendant said that he had been drinking that afternoon and that he could not recall anything that happened.

On Thursday, October 3, defendant was brought before the court for sentence. The court stated it found defendant was now sane and was sane when the offense was committed, that defendant killed his child, that the killing was willful, deliberate and premeditated, and that the homicide was murder of the first degree. The court reviewed the proceedings had up to that time and then said to the defendant:

''THE COURT: . . . before rendering judgment I will ask you if you have any legal cause to show why judgment should not be pronounced against you at this time?

THE DEFENDANT: No, sir, your Honor.

THE COURT: You have nothing to say one way or the other in this matter at this time?

THE DEFENDANT: Yes, I would like to know whether I am to be prosecuted by Mr. District Attorney Adams or not. I would like to have my say after he finishes.

THE COURT: Well, I am only asking you relative to this case, not some other case. Have you any legal reason to show why sentence shouldn't be passed upon you now in this case. That is all I am asking you.

THE DEFENDANT: No, sir."

The court then pronounced the death sentence.

Our state and federal Constitutions guarantee an accused in a criminal case the right to the assistance of counsel for his defense (Cal. Const., art. I, § 13; U. S. Const., 6th Amend.), and it has been held that a violation of the right secured by the 6th amendment may under some circumstances amount to a denial of due process under the 14th amendment. (*Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527] ; *Tomkins* v. *State of Missouri,* 323 U.S. 485 [65 S.Ct. 370, 89 L.Ed. 407] ; *People* v. *Napthaly,* 105 Cal. 641 [39 P. 29].) The vital importance of the right to assistance of counsel was stated in *Powell* v. *Alabama, supra,* at pages 68-69 as follows :

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and the knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him."

An accused charged with a capital offense is not afforded this basic right where the appearance on his behalf is made by an attorney who acts at the request of the prosecuting officer solely for the purpose of waiving the preliminary hearing, and who has no knowledge of the facts of the case and does not counsel or advise the accused with respect to the charge against him. (See *Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527] ; *People* v. *Mc-*

*Garvy,* 61 Cal.App.2d 557 [142 P.2d 92].) The service performed by an attorney under like conditions for such a limited purpose has been characterized as a mere "token" or "pro forma" appearance which does not give an accused the protection guaranteed by the Constitution. (*Powell* v. *Alabama, supra; People* v. *McGarvy, supra.*) And as stated in the McGarvy case, "Such a perfunctory appearance at the request of the district attorney is a practice not to be commended," since an accused is thereby precluded from receiving the effective aid guaranteed by the Constitution. (61 Cal.App.2d at p. 562.)

It is contended, however, that since defendant subsequently elected to proceed without counsel and pleaded guilty to the charge, he cannot now complain that he was denied his constitutional rights. The fact that defendant pleaded guilty is not conclusive. As stated in *Williams* v. *Kaiser,* 323 U.S. 471, 474 [65 S.Ct. 363, 89 L.Ed. 398], "The decision to plead guilty is a decision to allow a judgment of conviction to be entered without a hearing—a decision which is irrevocable and which forecloses any possibility of establishing innocence. If we assume that petitioner committed a crime, we cannot know the degree of prejudice which the denial of counsel caused. [Citation.] Only counsel could discern from the facts whether a plea of not guilty to the offense charged or a plea of guilty to a lesser offense would be appropriate." Nor is it conclusive that defendant elected to proceed without counsel. ▮ It is true that the right of an accused to the assistance of counsel may be waived (*In re Connor,* 16 Cal.2d 701, 706 [108 P.2d 10]), but before there can be an effective waiver the defendant must have an intelligent understanding of his act. (*Johnson* v. *Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461]; *Tomkins* v. *State of Missouri,* 323 U.S. 485 [65 S.Ct. 370, 89 L.Ed. 407].)

▮ One purpose of the constitutional guaranty is to protect an accused from his own ignorance of his legal and constitutional rights, and the guaranty would be nullified if it were held that a waiver made in ignorance of its consequences would remove the protection of the Constitution. As stated in *Johnson* v. *Zerbst, supra,* the constitutional right of an accused to be represented by counsel of itself invokes the protection of the court when the accused is without counsel, and "This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there

is an intelligent and competent waiver by the accused. *While the accused may waive the right to Counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.''* (Italics added.) (304 U.S. at p. 465.)

The determination of whether there has been an intelligent waiver of counsel involves a consideration of the nature of the charge, the facts and circumstances of the case, and the education, experience, mental competence and conduct of the accused. (See *In re Connor,* 16 Cal.2d 701, 710 [108 P.2d 10] ; *Johnson* v. *Zerbst,* 304 U.S. 458 [ 58 S.Ct. 1019, 82 L.Ed. 1461] ; see, also, *Williams* v. *Kaiser,* 323 U.S. 471 [65 S.Ct. 363, 89 L.Ed. 398] ; *Tomkins* v. *State of Missouri,* 323 U.S. 485 [65 S.Ct. 370, 89 L.Ed. 407] ; *Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].)

In order for a trial judge to determine whether there has been a competent and intelligent waiver of counsel, he must first ascertain whether the defendant clearly understands the nature and effect of his waiver. In a capital case where the defendant has not had the benefit of advice of counsel, and there is nothing to indicate that he understands the nature of the charge, the elements of the offense, the pleas and defenses which may be available, or the punishments which may be exacted, the trial judge does not sufficiently perform his duty if he merely advises the defendant that he has a right to counsel and that the death penalty may be imposed.

In *Tomkins* v. *State of Missouri* (323 U.S. at page 488), the defendant without the advice of counsel had pleaded guilty to murder. The court pointed out that one charged with murder could be found guilty of murder in the first or second degree or of manslaughter, and that *"The nature of the charge emphasizes the need for counsel. . . .* The punishments for the offenses are different. The differences between them are governed by rules of construction meaningful to those trained in the law but unknown to the average layman. The defenses cover a wide range. And the ingredients of the crime of murder in the first degree as distinguished from the lesser offenses are not simple but ones over which skilled judges and practitioners have disagreements. The guiding hand of counsel is needed lest the unwary concede that which only bewilderment or ignorance could justify or pay a penalty which is greater than the law of the State exacts for the of-

fense which they in fact and in law committed.'' (Italics added.) The elements of murder and manslaughter and the distinctions between the degrees of murder have received careful consideration and exhaustive treatment in several cases recently decided by this court. (See *People* v. *Holt*, 25 Cal. 2d 59 [153 P.2d 21]; *People* v. *Thomas*, 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Valentine*, 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Honeycutt*, *ante*, p. 52 [172 P.2d 698].) The discussion in those opinions of the conflicting interpretations of the statutes defining manslaughter and the degrees of murder shows the difficulties experienced by our courts in stating the applicable rules in instructions to juries.

There is nothing in the record which indicates that defendant had the slightest conception of the elements of the different offenses included in the charge, the available defenses, or the different punishments involved. Apparently all he knew was that the death sentence could be invoked and that he felt he should pay the extreme penalty for what he had done. He obviously did not understand that he could not be found guilty of murder of the second degree unless he caused the death of his baby "with malice aforethought," and that under the circumstances of this case he would not be guilty of murder of the first degree unless the killing were "willful, deliberate and premeditated." Paraphrasing the language quoted above from *Tomkins* v. *State of Missouri* (328 U.S. at page 488), the guiding hand of counsel was needed lest defendant, through ignorance and bewilderment, suffer a penalty greater than the law exacts for the offense he in fact committed.

The need of this defendant for the advice and assistance of counsel becomes even more apparent when we consider the legal definitions of the offenses included in the charge in relation to the facts of the case as disclosed by the evidence produced at the hearing. The only evidence bearing upon the essential element of premeditation was the statement of Mrs. Chesser that defendant had threatened the baby. No effort was made to develop this testimony and it does not appear what was said, or when, where and under what circumstances the asserted threats were made. As pointed out in *People* v. *Holt*, 25 Cal.2d 59, 70 [153 P.2d 21], "proof of malicious intent without the further proof that it was 'willful, deliberate and premeditated,' would establish second degree murder

but not first degree murder.'' Here the evidence as to intent was at least equivocal and subject to conflicting inferences. In addition, there was evidence which would indicate that defendant may have been so deeply under the influence of intoxicating liquor that he was incapable of forming in his mind that malice aforethought which is an essential element of the crime of murder in either degree. (See *People* v. *Holt, supra,* at page 82.) Defendant told the doctors who examined him that he was so intoxicated on the afternoon of August 7, that he could not remember anything that happened. Mrs. Chesser testified that defendant had ''started drinking'' in town that afternoon and brought some beer home with him, but she was not asked any questions designed to ascertain the extent of his intoxication.

It is clear from what has been said that ''the nature of the charge emphasizes the need for counsel'' in this case, not only because it includes a capital offense, but also because, when the charge is considered in connection with its factual background and the lesser offenses embraced within it, questions of vital import to defendant are presented, the significance of which he was apparently wholly unaware.

The trial judge should also take into account the education, experience, mental capacity, and conduct of the accused in determining whether his willingness to waive counsel may be due to lack of ability to comprehend his situation. These factors were considered by this court in the Connor case (16 Cal.2d 701) in deciding whether there had been an intelligent and competent waiver of counsel by the accused. Connor had a good education and due to previous encounters with the law he was familiar with legal procedure in criminal cases. His conduct at the trial revealed a clever criminal who had feigned ignorance and stupidity in an effort to mislead the trial judge. The court concluded that he had ''intelligently and competently waived the right to counsel with full understanding of the consequences of his act.''

The record in this case presents a very different picture. Defendant was an itinerant farm hand who evidently had not had any previous experience with courts. There is no direct evidence as to the extent of his education but his answers to questions would indicate that it was very limited. With reference to his mental competency it appears that before his discharge from the service he had undergone observation in a ''lock ward'' of an Army hospital. And the district

attorney, as a result of his contact with defendant, felt impelled to suggest that he be examined pursuant to section 1368 of the Penal Code because a doubt had arisen as to his sanity. Defendant's conduct at the hearing shows he was contrite, confused and bewildered, and had little, if any, conception of the nature of the proceedings or of the elements of the charge against him. His statement when called before the court for sentence at the conclusion of the hearing shows that he did not realize what had taken place.

In view of the seriousness of the charge, the surrounding facts and circumstances, and defendant's evident lack of understanding of his rights and the consequences of his acts, we are of the opinion that there was not a competent, intelligent waiver of counsel.

The judgment is reversed and the cause remanded for trial. It is further ordered that if defendant is unable to employ counsel the trial court shall appoint counsel to defend him, and shall permit defendant to change his plea if he be so advised.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.