[Crim. No. 6333. Second Dist., Div. One. Oct. 9, 1959.]

THE PEOPLE, Respondent, v. ROBERT E. WILLIAMS, Appellant.

366

Barbara Warner for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

THE COURT.—On May 9, 1958, the district attorney of Los Angeles County filed an information wherein defendant was accused of the crime of murder (Pen. Code, § 187), in that on or about November 20, 1955, he feloniously killed Ralph Burgess. On May 12, 1958, defendant was arraigned in the superior court, and on his motion, the cause was continued to May 14, "to allow defendant time to obtain counsel." On the last named date the matter was again continued on motion of defendant, to May 16, "to allow defendant's counsel to be present," at which time defendant again appeared without counsel, and the clerk's transcript reflects the following: "Defendant refuses the Court's offer to appoint counsel for defendant and requests to represent himself in propria persona. Defendant moves to dismiss under 995 Penal Code. Motion is denied. Defendant pleads 'Not Guilty' as charged. Trial is set for June 10, 1958 at 9:00 A.M." According to the clerk's transcript, on May 27, 1958, "On the Court's own motion, trial is advanced from June 10, 1958. Deputy District Attorney L. Compton and the Defendant in propria persona, present. The Court again offers to appoint counsel for defendant and offer is refused by defendant. Request of defendant to have certain witnesses subpoenaed for trial who are prisoners at Folsom Prison is denied. Request of defendant to have certain other witnesses subpoenaed is granted and the clerk is instructed to prepare subpoenas. Trial is re-set for June 10, 1958. . . ." Again, on June 6, the court on its own motion advanced the trial from June 10, and defendant appeared without counsel, whereupon, according to the clerk's transcript the following took place: "Defendant's request to have private counsel appointed by the

Court is denied. The Court's offer to appoint the Public Defender to represent defendant is again refused by defendant. Trial is reset for June 10, 1958 . . . ,'' upon which date, ''Due to calendar congestion, trial is continued to June 11, 1958.'' All of the foregoing proceedings were had before Judge Ralph K. Pierson. On June 10, in a letter to Judge Pierson, defendant requested that the cause be tried before another judge on the ground that defendant ''felt and believed'' he could not obtain a ''fair and impartial trial'' before said judge, ''By reason of prejudice feeling, and error statements made, by said Judge Ralph K. Pierson.'' On the following day, Judge Pierson transferred the cause to another department of the court presided over by Judge Beach Vasey. When the latter called the case for trial, there was some discussion concerning defendant's request that some three witnesses confined in Folsom State Prison be summoned to testify in his behalf. The district attorney conceded the possible materiality of the testimony which defendant expected such witnesses to give, and the court stated, ''Mr. Williams, Mr. Compton (Deputy District Attorney) has suggested that they (the witnesses) would not be needed to begin this trial and if the occasion arose we could secure their attendance here. Is that arrangement satisfactory with you?'', to which defendant replied, ''That would be quite all right, yes.''

The record also reflects that upon this occasion, and with regard to defendant being represented by counsel, the following occurred:

''THE COURT: And you have chosen not to be represented by an attorney, but to represent yourself?

''THE DEFENDANT: That is correct.

''THE COURT: Now, Mr. Williams, the charge against you, of course, is a serious charge. I will renew the offer that has been previously made to you to appoint counsel to represent you, if you desire to have counsel to represent you. I do not wish to take any advantage of anything that has happened in any other court and I don't want to force you to trial representing yourself. Let me state that in representing yourself I will do everything I can to see that you get a fair and impartial trial, but representing yourself, you are not excused from any of the legal requirements that would be involved if you had counsel representing you.

''THE DEFENDANT: That is understood.

''THE COURT: You are not entitled to any special privi-

leges or favors because you elect to represent yourself. Do you understand that?

"THE DEFENDANT: I understand that.

"THE COURT: *I will, despite the fact that we are all here ready to go with the trial, renew the suggestion that if you want to change your decision to represent yourself and have an attorney represent you, I will still give you that opportunity.*

"THE DEFENDANT: *I appreciate it very much, but I still want to represent myself.*

"THE COURT: *You understand that if you do that that it does not give you any special privilege or any rights that you would not have if you were represented by an attorney?*

"THE DEFENDANT: *Right.*" (Emphasis added.)

The cause proceeded to trial before a jury which found defendant guilty of murder as charged in the information, and found it to be murder of the first degree. Finding that defendant was under the age of 18 years at the time the offense was committed, to wit, 17 years old, the court sentenced him to state prison for life.

From the judgment of conviction, the sentence, and the order denying him the right to counsel, defendant prosecutes this appeal. ██ An appeal from the sentence is not authorized by law (*People* v. *Gallardo,* 41 Cal.2d 57, 60 [257 P.2d 29]), and equally nonappealable is the order as to counsel, the latter being reviewable upon an appeal from the judgment (Pen. Code, § 1237). The last two ineffectual appeals must, therefore, be dismissed.

Concerning the factual background surrounding this prosecution, the record reveals that about 10:30 or 11 o'clock, on Sunday morning, November 20, 1955, Thelma Conrad and Marjorie Perez entered McKinney's Furniture Store at 2430 East Pacific Coast Highway, Long Beach, where a salesman who had been sweeping greeted them and accompanied them around the store. About 15 or 20 minutes later, as the ladies were preparing to leave, three men entered the store, two coming into the store and the third remaining at the door. The salesman went over to the two men who had actually entered the store, and they stood there in front of him. Just as the ladies were about to leave Marjorie Perez spoke to the man standing at the door and as she spoke one of the two men within the store turned around and faced the ladies. Both Thelma Conrad and Marjorie Perez positively identified that man as the defendant. The latter and the other man

were wearing black waist-length windbreaker jackets. The other man in the store was just a little shorter, with the same color hair. Both had dark hair. Defendant appeared to have dark wavy hair. He appeared to be 6 feet tall, medium in build, about 135 to 140 pounds. The man at the door was light-complected, sandy-haired and wore a light shirt, kind of bluish-gray plaid, light slacks. He was around five-eight or nine in height. The two women then left the store soon after the man who had been standing at the door left and walked down the street.

Mr. Everett L. McKinney owned the furniture store at 2430 East Pacific Coast Highway on November 20, 1955. On that date Mr. Burgess was working for Mr. McKinney and came to the door about 10 a. m. to obtain the keys to the store as Mr. McKinney lived at the rear thereof. At about 11:20 that morning Mr. McKinney came into the store and found Mr. Burgess lying in the aisle. Mr. McKinney did not examine the body closely but immediately called the police. After the police arrived the personal effects of Mr. Burgess were checked and nothing appeared to be missing nor was there anything taken from the store.

Officer Wallace J. Dillon arrived at the furniture store at 11:45 a. m. and observed the body of a man lying in the aisle. He examined a .32 caliber Hopkins-Allen chrome-plated revolver that was in the desk drawer in the back of the store. It was fully loaded and had not been fired.

An autopsy was performed by Dr. Lester Adelson, Chief Deputy Coroner, on Ralph H. Burgess at 5:40 p. m. on November 20, 1955. Based upon the findings contained in this autopsy report Dr. Frederick D. Newbarr was permitted to testify over the objection of defendant that in his opinion the cause of death was a gunshot wound of the head with intracranial hemorrhage and lacerations of the brain. The bullet that was removed from the victim's head was turned over to Officer Dillon by Mr. Dillard of the coroner's office and Officer Dillon gave it to Mr. Ralph I. Simond a ballistics expert who, after examining it, formed the opinion that it was fired from a .32 caliber Colt. During the year 1958, defendant was an inmate of Folsom Prison where he was serving a life sentence on a previous conviction for the murder of one Manistar in San Pedro, near Long Beach in Los Angeles County.

During February of 1958, Robert A. Heinze, Warden of

the State Prison at Folsom, received a letter purporting to be signed by defendant, and reading as follows:

"Dear Sir: I am writing this letter because I am tired of doing time. This murder happened on November 20, 1955, about 11:15 a. m. in McKinney's Furniture Store in Long Beach, California. I was going to rob the guy but I got scared and shot him in the head with a .32 pistol. When he came after me I shot him and ran out without robbing him. This crime happened on a Sunday morning. I was paroled from DVI Tracy, California, on November 10, 1955, and ten days later I killed my first human. It is all off my chest now and I want to go to the gas chamber. I am tired of doing time.

"Yours truly, Bob E. Williams, Number A38757, Cell 131-4A."

Upon receipt of this letter the warden sent for defendant and had a conversation with him in regard to it. Defendant asked the warden to forget about the letter for he had "blown his top" the night he wrote it. The warden was satisfied that defendant had written the letter as he was familiar with the latter's handwriting.

On February 18, 1958, Mr. Harry P. Finch, Detective Inspector of the Long Beach Police Department, had a conversation with defendant at Folsom State Prison. At first defendant had refused to even talk to Officer Finch, but eventually did agree to an interview. Officer Finch told defendant that he had been informed that the latter had written a letter to Warden Heinze confessing to a murder in Long Beach. Defendant said that the reason he had written that letter was to have someone from Long Beach come up to talk to him; that he was serving a life sentence for a murder that he didn't commit; that he did not kill Manistar in San Pedro; that he had not killed Mr. Burgess in Long Beach; that he would like to have a sodium pentothal test to prove that he was innocent. He said that a lie detector test had not worked on him. He said that he wrote the letter because he wanted to prove that he had not killed Manistar. He stated that he had read about the Burgess murder in a Long Beach newspaper, the Press Telegram, and felt that if he confessed to this murder it would show that if he could confess to a murder and knew enough about it that it would indicate that he could confess to the other murder and that he had not been involved in that.

On February 19, 1958, Officer Finch had another conversation with defendant. The statements made by defendant during this conversation were given freely and voluntarily, without any threat or abuse or any holding out of hope of leniency or reward. Officer Finch told defendant he was serving a life sentence for a murder that he had confessed in the same way he had confessed to the Burgess case. He told him he didn't think he was a "dumbbell"; that he thought he was a fairly intelligent man; that he didn't think he would do it twice. He told him that he had written a confession confessing to the thing unsolicited; that if he had wanted to gain attention, as he said the day before, "he would not have refused to talk to us when we first arrived there"; that he would not have asked Warden Heinze to tear the letter up, as he stated he had done. To this defendant replied, "Well, you got a point." Defendant asked the officer if there was supposed to have been a couple of women witnesses at the furniture store. The officer told him that there wasn't a witness to the actual murder, but two women had seen some men go into the store as they were leaving. He asked defendant how he knew that there were two women witnesses there, if he had not been there. Defendant stated he was not sure, but he said he thought he read about it in the paper. The officer told defendant that he read the same article and did not believe that it had been in the paper. Defendant said, "Well, I think I heard it some place." He then asked the officer if "there were supposed to be three guys on the job," stating that was what he had been told. Officer Finch then said, "Bob (defendant Williams), why don't you get this thing off your chest and tell me the whole story?" Defendant said, "I am in a tough place. If I 'rat' on anybody else I will end up with a shiv (knife) in my back. I can't tell on my partners." Officer Finch said, "Bob, are you telling me that you killed Burgess?" Defendant replied, "Yes. Let's put it this way. I was there but I didn't pull the trigger." He stated that he and his partners had been riding around on the Saturday before the murder; that they had driven by the furniture store. They had looked at the big windows and they could look in and it looked like a "fair place." He said that on the following Sunday morning they were driving by looking for a place. They saw that the furniture store was open so they decided to take it. He stated that the store was located on Pacific Coast Highway on the south side of the street; that it was

near a drive-in and about two blocks from a main intersection; that as you left the place, walked out the door, you could see Signal Hill. Defendant refused to tell who his partners were but when questioned by Mr. Compton (deputy district attorney), who had accompanied Mr. Finch to Folsom that day, he did give a description as to how they appeared on the day of the murder. Defendant said, "I was dressed in denims. I had on a short blue suede jacket, zipper-style. One of the other fellows was about my size. He had a gaucho shirt and peggers. They were not white and they were not brown. They were kind of an in-between color." He said that his jacket was dark blue and that one of the other fellows had worn a jacket also. The third man was about five seven or eight; that he was dressed in gaucho shirt and peggers and that his hair was a brownish color. He described details of the store as to the aisle, the storeroom and a desk, described the victim as a man in his sixties and where he had been lying in the store. Then defendant said, "Compton, you know and I know that if I answer any more questions I will be talking myself into a murder first." He refused to make any further statements but was asked to write if he had anything more to say.

Officer Finch received a letter from defendant dated February 26, 1958, which read as follows:

"Dear Harry:

"Just a few lines to say hello. I was just lying here in my cell and decided to write you a line or two. You told me to write you if I wanted and you would answer me. I would like to ask you if you would inform me as to what is going to happen on this store deal. I mean, if Compton wants to beef me, I wish he would do it and get it over. If he isn't, I wish he would say so. Like I told you that day you and I was talking, I will take the test, but I won't say anything. You did me fair, so I will tell you. You have got me made; you know it, I know it and so does Compton. Speaking of that clipping, I just used that as a front, but when I seen it I got all upset because it started all bothering me and messing up my mind, but I tried to use it to talk my way out of both beefs. I will ride the beef, but I will not rat on my partners, regardless of the cross they put me in. I will ride the beef like I did before on the Manistar murder, but the only reason I am writing this letter is because I am trying to be fair to you for being fair to me. There is no use

running all over town when you have me made on the beef. I am not going to put my own self in the cross, but I am just letting you know you have the guy you been looking for, but I ain't going to frame myself. It's all off my chest now. That cat's out of the bag and that is all I have to say in regard to the matter. I am sorry my writing is bad, but I am in the 'hoe' and I am having a hard time to write this letter. I have no hard feelings against you. You are a pretty good cop in my book. Well, I will close this for now. Answer if you will and inform me as to what I have asked you in this letter.''

Mrs. LaDonna Inmann testified that she was acquainted with defendant ''for some period of time''; that prior to November 10, 1955, defendant had resided in her home and had ''been around'' the same for a period of time. That defendant was away ''around in November and October, 1955.'' That during the early part of November defendant telephoned the witness and in the course of the conversation the witness said to defendant, ''Well, I told him that he was going to get in trouble again if he didn't straighten up and get a job.'' That defendant stated, ''No, I won't,'' to which the witness replied, ''Yes, you will if you don't get something to occupy your time,'' whereupon defendant stated, ''No, because I can get a gun.''

Defendant did not testify as a witness in his own behalf but called several other witnesses. Linda Copley testified she had known defendant some three years. That she saw him around November 12, 1955. He had formerly lived with the family of the witness. That when she saw defendant about November, 1955, his hair ''was like you have it now, except it was shorter.'' Shown a photograph of defendant, the witness was asked, ''I will show you this photograph of the defendant. How would you describe his hair in that picture?'' to which the witness answered, ''It is full, but I would not say it was wavy.'' The witness testified defendant did not at any time to her knowledge have a weapon in his possession. She had never seen defendant, ''pull a weapon on some other person,'' nor had she ''ever seen the defendant arrested for any crime of violence.'' That in November, 1955, defendant never ''discussed a gun'' with her. That at that time defendant weighed 178 pounds and was 6 feet 4 inches tall.

LaDonna Inmann who had previously testified for the prosecution, when called as a witness for the defendant,

testified to the same effect as the previous witness, and in addition, stated that defendant's hair at the time of the homicide in question came down in a curl or a dip in the front and combed back on the sides. She had never seen defendant with a gun and when she received the telephone call in which he mentioned that he was able to get a gun she "took it as a joke." He did not tell her that he was actually going to get a gun and do something violent.

To the same effect was the testimony of Aloha Bliss, Sharon Lacy, Ellen Brooks and Monnie Moody.

Defendant called Officer Finch as a defense witness and brought out substantially the same testimony he had previously given. Officer Finch had shown several pictures to Mrs. Conrad and she had placed the one of defendant to the side and stated that it was the only one she could positively identify. That defendant denied having written the letters to the warden and Finch although he had also admitted writing them. Officer Finch did not believe that anyone was arrested on suspicion of the Burgess murder nor has the gun been found. To Officer Finch's knowledge no one witnessed the actual murder other than the guilty parties. The car used by the murderer has never been found. The witness was asked, "You say that you have witnesses that identified the defendant as being there. They identified him as being in the furniture store but they didn't identify him as being there when someone was killing someone?" to which the witness answered, "Yes. Prior to the murder; you were there prior to the murder."

Donald C. Maddock, a newspaperman, took a picture of defendant in April, 1956, which appeared in the Press Telegram April 22, 1956. In Maddock's opinion defendant's hair does not appear curly in that picture.

The records of the DeLuxe Water Taxi Company reflected that on November 18, 1955, the defendant was shown as working from 11:47 p. m. of the 18th to 7:43 a. m. of the 19th. It shows him working from 11:49 p. m. of the 19th to 7:42 a. m. of the 20th. It shows him working from 3:47 p. m. to midnight of November 28th, 1955, and from 11:41 p. m. of the 15th of December, 1955, to 7:51 a. m. of December 16, 1955.

As his main ground for reversal of the judgment appellant earnestly urges that he was denied due process of law in that he was deprived of his right to counsel of his own choice. He asserts, "that the accused in a capital case has the constitutional right to be represented by private

counsel of his choice.'' With this contention we cannot agree. Article I, section 13 of our state Constitution, and Penal Code, section 686, provide that in criminal prosecutions the accused has the right to appear and defend in person and with counsel. Penal Code, section 987, reads: ''If the defendant appears for arraignment without counsel, he must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desires the aid of counsel. If he desires and is unable to employ counsel, the court must assign counsel to defend him.'' There is nothing in the law which entitles an accused to have the court appoint any particular attorney to defend him, and the refusal of the court to name a particular counsel was not a denial of defendant's right to be represented by counsel for, as said in *People* v. *Manchetti,* 29 Cal.2d 452, 458 [175 P.2d 533]: ''. . . defendant had no absolute right to be represented by a particular attorney.'' (See also *People* v. *Stroble,* 36 Cal.2d 615, 629 [226 P.2d 330]; *People* v. *Howard,* 150 Cal.App.2d 428, 430 [310 P.2d 120].)

Appellant does not challenge the verity of the record as heretofore set forth, indicating as it does, repeated and rather insistent efforts upon the part of the court, prior to the trial, to induce appellant to have the aid of counsel and the several offers made by the court, to appoint the public defender, but predicates error upon the denial of appellant's request for the appointment of a particular attorney, and his refusal of the services of the public defender, as evidenced by a letter from appellant to the court, dated June 3, 1958, and reading as follows:

''Judge

''I wish to inform you that on June 10, 1958, is my date for a jury trial, at this time, I state there will be know trial on that date or any other date, unless the court comes too reason.

''I am being tired [sic] for murder 1st. I am already convicted of one murder.

''Mrs. Barbara Warner a attorney, has contacted you and has ask you to appoint her, as my attorney. you denied this. I Will *not* except a P.D. onely [sic] her. because I feel the P.D. is unfair. I feel also they are too loaded with case's too give mine the work it needs, I feel also, they are against and hate the name Bob Williams due to a case (murder) which take places in 1956, the P.D. office is a tickets office for

the state prisons. Not only that, But the P.D. and the D.A. are frainds and they do alot of under the covers deals on case, I feel also, I would not be given a just trial, by a P.D. I feel also that this court is againest me and I hereby ask the court to dismiss its self of this case, due to the fact I feel I am being mislead, misformed, and traped, I feel also. this court is way unfair, and that if can not and will not give no a fair trial, there for I request, my case too be transfered too Judge Beach Vasey court.

"I will pay $500.00 for a attorney Mrs. Warner and I request the court too pay the remainer, so that I may have a just and fair attorney to represent me in order I may receive justice, instead of unjustice, Which I am receiving from this court.

"reply"

The record unequivocally shows that appellant in no uncertain terms, declined the services of an attorney to represent him at his trial unless the court would appoint a particular attorney of appellant's choice. The aforesaid constitutional guaranties afford him no such right.

Appellant further contends that, "The mere fact that an accused in a capital case lacked confidence in the public defender should be sufficient grounds standing alone to disqualify him." In support of this argument, appellant refers to section 987a of the Penal Code, authorizing the appointment and payment of private counsel in a criminal case. However, this section explicitly provides that the provisions thereof are applicable only ". . . in county, or city and county, in which there is no public defender. . . ."

As to the aspersions cast by appellant upon the public defender of Los Angeles County, it has been judicially declared that that official and his staff have higher-than-average ability in defending criminal actions (*People* v. *Adamson,* 34 Cal.2d 320, 333 [210 P.2d 13]; *People* v. *Simeone,* 132 Cal. App.2d 593, 597 [282 P.2d 971]). We perceive no grounds, legal or otherwise, why an accused should be permitted to refuse the services of the public defender, waive his right to counsel unless one of his choice is appointed, and then have his conviction reversed because he did not choose to be represented by the legal aid provided by the county.

It is next contended by appellant that he was a minor (20 years of age) and was incapable of waiving counsel. In support of his claim appellant asserts that his

power to make contracts is limited by Civil Code, section 33; that pursuant to the provisions of Civil Code, section 34, he can disaffirm his contracts made during minority. That he is not competent to contract marriage except with the consent of his parents or guardian (Civ. Code, § 56); that he was subject to the guardianship laws, and to the provisions of the Juvenile Court Act (Prob. Code, § 1405; Welf. and Inst. Code, § 700). From the foregoing, appellant argues that, "he acting alone did not have the capacity to intelligently waive his counsel" especially since "The instant case was capital, involving the death penalty." We are not in accord with appellant's reasoning. In the first place, although it is not determinative of the issue of whether appellant intelligently and understandingly waived his right to counsel, it should be noted that the instant prosecution did not "involve the death penalty" because of his age, 17 years, at the time of the commission of the homicide, the extreme penalty could not be exacted. As to appellant's argument concerning the disqualification attached to minors in various affairs of life, we are persuaded that since the court was clothed with jurisdiction to try him, and that is conceded, then in our opinion he had the right to waive or refuse appointment of counsel if at the time he did so, he had an intelligent conception of the consequences of his act in declining the aid of counsel unless the court would appoint counsel of his own choosing, a right which, as we have heretofore held, he did not have.

It is of course true that both the federal and state Constitutions guarantee an accused, in a criminal case, the right to the assistance of counsel.

And while the right of one accused of crime to be represented by counsel should be jealously guarded, it may be waived (*In re Connor*, 16 Cal.2d 701, 706 [108 P.2d 10]).

No pressure must be brought to bear upon an accused to compel a waiver, and the court must be assured that the defendant has an intelligent understanding of what he is doing (*People* v. *Chesser*, 29 Cal.2d 815, 821 [178 P.2d 761, 170 A.L.R. 246]; *In re Tedford*, 31 Cal.2d 693, 695 [192 P.2d 3]; *In re James*, 38 Cal.2d 302, 313 [240 P.2d 596]).

From a review of the proceedings hereinbefore narrated, it is at once apparent that the trial court strenuously exhorted appellant to avail himself of appointed counsel, informed him of the seriousness of the charge with which he was confronted, and the dangers with which declination of counsel were fraught. The record reveals that appellant had

a prior encounter with the law, was previously convicted of the crime of murder, for which he was serving a life sentence in Folsom penitentiary, and that he had a pretty good general knowledge of court procedure. Appellant actively participated in the trial. Made a motion to dismiss under section 995 of the Penal Code. He examined prospective jurors extensively and not without ability. He exercised numerous peremptory challenges. Throughout the trial he made objections to proffered testimony, cross-examined prosecution witnesses with marked intelligence; examined witnesses called in his own behalf and succeeded in bringing out through them matters which he desired in his defense. His argument to the jury cannot justly be strictured as that of an uneducated and inexperienced man. ▆ In order to permit an accused to waive his right to counsel it is not necessary that the latter demonstrate to the court that he possesses the acumen or the learning of a skilled lawyer. All that is required is that the defendant have an intelligent conception of the consequences of his act in refusing the aid of counsel. ▆ Throughout the trial the learned trial judge sought to advise appellant concerning the rules of evidence and assisted him when questionable items of evidence were offered. In the case now engaging our attention, the record shows that appellant fully understood what he was doing, handled his case with considerable ability, and was protected by the trial judge. The record before us does not warrant any inference other than that the waiver was an intelligent one by a person possessing the requisite capacity to waive his right to counsel. In the case at bar, viewing the record of proceedings had before the trial judge, coupled with the fact that appellant had previously been convicted after trial, of the crime of murder, it could well be assumed in the court below, "that he (appellant) was not unfamiliar with court proceedings, and that there is no injustice to him to apply the rules of waiver to his case in view of his undoubted familiarity of such matters and his attitude in court" (*In re Connor*, 15 Cal.2d 161, 165 [99 P.2d 248]).

Appellant relies upon the recent case of *Reynolds* v. *United States* (No. 16,249, United States Court of Appeals, Ninth Circuit, decided June 1, 1959), 267 F.2d 235, 236, wherein a judgment of conviction was reversed on the ground that the accused was denied his right under the Sixth Amendment of the Constitution of the United States, to be defended by counsel of his own choice. However, the cited case is readily

distinguishable from the case now under consideration. In the *Reynolds* case, trial was held in the United States District Court for the District of Hawaii. In its decision reversing the conviction, the Court of Appeals stated, "The record is clear that appellant attempted to dismiss his local counsel following the order of the district court refusing a continuance of the trial, which appellant sought in order to enable counsel from the mainland to represent him. The record is further clear that the appellant sought to represent himself at the trial, but the district court refused him the right to do so and insisted upon appellant's representation at the trial by the local counsel." The court then goes on to say, "In our view the district court erred, in the circumstances of this case, by denying appellant the right to conduct his own defense. As this court, speaking through Judge James Alger Fee, stated in *Duke* v. *United States*, 255 F.2d 721, at page 724 (certiorari denied 357 U.S. 920 [78 S.Ct. 1361, 2 L.Ed.2d 1365]) : 'There are two principles which are founded on reason and authority in this field to which this Court gives full weight. First, an accused has an unquestioned right to defend himself. (Citing Title 28, U.S.C.A. § 1654.) Second, an accused should never have counsel not of his choice forced upon him. (Citing *Adams* v. *United States*, 317 U.S. 269, 279 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435].) This court has never failed to recognize either of these fundamental rights.' " Inherent in this decision is the holding that an accused has the right to defend himself, and if he so decides, the court may not thrust counsel upon him. In the *Reynolds* case, *supra,* the appellant desired to employ counsel and bring him from the mainland, but the trial court refused a continuance to enable him so to do, and when he then decided to represent himself, the appellate court held that under Title 28, U.S.C.A., Section 1654, he had, "an unquestioned right to defend himself." In the case now before us, the trial court recognized that very right. Appellant herein did not seek to engage counsel of his choice, but insisted that the court appoint such counsel and that the county pay at least a portion of such counsel's fee. We are satisfied that the holding in *Reynolds* v. *United States, supra,* does not militate against what we have herein held under the facts of the instant case.

Appellant's present counsel on this appeal urges certain deficiencies in the matter of legal learning of and acumen on

the part of the accused in the conduct of his defense at the trial, pointing out that he did not know, among other things, "that the corpus delicti must be established before the admission of the confession'; was unaware of the foundational requirements for the admission into evidence of a confession; knew nothing about "opening statements, jury instructions, the Uniform Business Records Act, the rules of evidence or the citing of the district attorney for misconduct." ▮ These contentions are succinctly and effectively answered by our Supreme Court in the recent case of *People* v. *Mattson,* 51 Cal.2d 777, wherein, at page 794 [336 P.2d 937], it is said that, "The trial judge in discharging his 'serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver [of the right to counsel] by the accused' (*Johnson* v. *Zerbst* (1938), *supra,* 304 U.S. 458, 465 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357] ; *People* v. *Chesser* (1947), *supra,* 29 Cal.2d 815, 821-822 [178 P.2d 761, 170 A.L.R. 246]) *has no duty to give defendant a legal education* . . .'' (Emphasis added). ▮ And again, at pages 793, 794, "Where a defendant charged with crime is unable to employ counsel, is not statutorily required to have counsel (*ante,* footnote 4), and is competent to decide whether he desires counsel, the defendant during the proceedings before the magistrate and the trial court has as a matter of absolute right but two choices in the matter of a court-appointed attorney; he can accept representation by counsel (as most defendants with the ability to employ counsel have the good sense to do) or he can elect to represent himself. ▮ *If he makes the latter election, he assumes for all purposes connected with his case, and must be prepared to be treated as having the qualifications and responsibilities concomitant with the role he has undertaken: he is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded defendants who are represented by counsel. (People* v. *Chessman* (1951), 38 Cal.2d 166, 174 [2] [238 P.2d 1001].)'' (Emphasis added.)

And, to the foregoing might be added, in the instant case we have the warnings and admonitions given appellant by the trial court as to the disadvantages that are invariably encountered where an accused elects to represent himself in the trial of a criminal case.

Appellant next asserts that "throughout the course of the entire trial, the prosecution assumed this position of apparent 'friendship' with the defendant, advising him as to the method

in which to handle his trial, and telling him the reasons for various rulings by the court. In particular, defendant was told by the prosecution that the so-called confession would be admissible in its entirely; that the judge would read the law to the jury and that 'we ought to explain to Bob' how the jury instructions were given; the suggestion by the prosecutor that certain witnesses requested by defendant were not needed but that if it became necessary, the witnesses could be brought down 'during the course of the trial' for the benefit of defendant, which, in effect, lulled defendant into forgetting his witnesses during the trial. In addition, the offered stipulations as to records, and the 'explanation' offered by the deputy district attorney, as to why defendant wanted the records mislead the defendant into forgetting the future requests which had to be made in order to produce the evidence he desires. Further, the 'explanation' of the jury instructions by the deputy district attorney to defendant, and the representation of the deputy district attorney that no instruction on the issue of voluntariness was needed; the representations that the case was either 'first degree or nothing' and that 'there are cases which hold that where a defendant claims not to have been present at all or not to have participated, that it is first degree or nothing unless the People's evidence shows it to be something less than first . . . ,'' are clearly misstatements of the law by the prosecution. Again: 'In a sense, it would be unfair to him, I would think, to offer a possible second degree on some one of these speculative theories. If we find he was just not there, if he had nothing to do with this at all, he is entitled to an acquittal. In other words, Bob was either there to rob him and he was killed in a robbery, or Bob was not there and he had nothing to do with the case. That is my position.' ''

After a perusal of the record, we are persuaded that these claims of appellant are correctly disposed of by the attorney general in his brief, from which we quote the following: ''Appellant asserts that he was told by the prosecutor that the confession would be admissible in its entirety. The proscecutor stated, 'I told him I thought it would be admissible, but that we could go in chambers and discuss it and let him present his objection.' As the evidence developed the whole would have been admissible on the issue of why appellant had written the confession letter, however, to avoid any prejudice to appellant until that issue arose the parts of the

confession relating the previous crime were deleted and not introduced as part of the confession. Therefore the statements made to appellant could not have prejudiced him.

"Appellant asserts that the statements, by the prosecutor, 'I think we ought to explain to Bob that after we argue the Judge will read the law to the jury. . . . And both sides generally submit instructions that they desire to be read to the jury. Although you don't obviously have the facilities to provide him with instructions, I have turned in a stack of instructions which I feel are applicable to the case.' and

" 'THE COURT: I think it might be well to tell Mr. Williams that the defendant does not submit any instructions. You may, but it is frequently the case that the defendant does not, even when he is represented by an attorney. The District Attorney provides instructions and then the Court studies these instructions and determines which ones to give and which ones not to give. Sometimes the Judge gives instructions on his own which have not been submitted on either side.' (No objection voiced to instructions given.)

"These statements were by way of explanation of the usual procedures and correctly informed appellant of his right to suggest instructions to the jury. He had opportunity to read these instructions and obtain any desired explanations at that time. All the instructions were considered and approved by appellant. Neither the court nor the District Attorney had a duty to inform appellant as to all possible instructions for the court had the duty to instruct on his own motion instructions necessary for a proper determination of the case. (*People* v. *Putnam,* 20 Cal.2d 885 [129 P.2d 367].) These statements did not have any prejudicial tendency.

"Appellant asserts that the suggestion by the prosecutor that certain witnesses requested by defendant were not needed but that if it became necessary, the witnesses could be brought down 'during the course of the trial' for the benefit of defendant, in effect, lulled defendant into forgetting his witnesses during the trial. Actually the prosecutor merely stated that the witnesses were not needed to proceed with the trial up to the point about the writing of the letter. Then the prosecutor offered to secure the attendance of these witnesses if and when appellant desired their presence. Surely this was reasonable conduct and could not be considered the cause of appellant forgetting his witnesses altogether. Appel-

lant had the intelligence to select these witnesses for a particular point and he certainly would remember how he prepared his case. Moreover, at the commencement of appellant's defense the court brought attention to the witnesses referred to above and asked appellant if he wished to have them brought down, however, it developed that their testimony would have been inadmissible as merely repeating self-serving declarations of appellant and he decided not to call them. No prejudice can be predicated on that point.

"Appellant asserts that the offered stipulations as to records and a newspaper picture and the prosecutor's explanations as to their intended purpose for the defense misled appellant into forgetting the future requests which had to be made in order to produce the evidence he desired. How these statements could have caused appellant to forget the case he had prepared we submit is difficult to comprehend, even so, this does not appear to have been the case since at the time appellant commenced his defense the prosecutor provided appellant with an enlargement of a picture of him that appeared in the newspaper and a police photograph for his use in defense. Appellant introduced testimony concerning the photograph and introduced the photograph into evidence in his defense. He also cross-examined the witnesses who identified him using reference to the pictures. As to the records of employment to which there was reference above, they were read into the record by the District Attorney and introduced into evidence for the defense. Therefore it is difficult to perceive any prejudice to appellant on that account.

"Appellant asserts that the conversation between the prosecuting attorney, the judge and himself in connection with the proposed instructions to the jury prejudiced his defense. There was no prejudice due to the prosecutor discussing the instructions he had submitted and appellant had all these instructions before him to read and take whatever course of action he desired. As to the statement that no instruction on voluntariness was needed, clearly, no issue of involuntary confession was presented by the evidence. Appellant did not take the stand and the People's testimony indicated that the confessions were free and voluntary. (See *People* v. *Dorman,* 28 Cal.2d 846, 854 [172 P.2d 686] ; *People* v. *Bigelow,* 104 Cal.App.2d 380, 389-390 [231 P.2d 881].) The statement was entirely correct and no such instruction

was required. Furthermore, the instructions given on confessions indicated that the confession must be a voluntary one. In connection with the statements that the case was either first degree or nothing and that there were cases which hold that where a defendant claims not to have been present at all or not to have participated, that it is first degree or nothing unless the People's evidence shows it to be something less than first, no prejudice can be found. The conclusion reached by the prosecuting attorney and ultimately by the court was that the case did constitute first degree murder or nothing and the jury was so instructed. There was no evidence on either side to indicate anything other than that the murder occurred during the perpetration of a burglary and robbery. Appellant did not take the stand and furnish the jury with any facts which would tend to show manslaughter or second degree murder. The instructions on this issue were discussed at length with appellant and he acquiesced in the decision of the court. Therefore, no error could have been predicated on the giving of these instructions and the refusal to give instructions on lesser degrees of homicide. Even though the prosecuting attorney may have been incorrect in his statement about cases holding as he said, his reasons for the exclusion of any instruction on lesser degrees of homicide were correct and no prejudice resulted. (See *People* v. *Dorman, supra,* 28 Cal.2d 846, 854-855 [172 P.2d 686] ; *People* v. *Riser,* 47 Cal.2d 566, 581-582 [305 P.2d 1].) The same reasoning would apply to the statement by the prosecuting attorney that it would be unfair to appellant to offer the jury a speculative second degree theory. This was not the reason for the ultimate decision of the court as to the instructions he would give.''

Appellant next charges the deputy district attorney with prejudicial misconduct in his argument to the jury. The first challenged statement was that made by the prosecutor when he told the jury, ''He (appellant) was given plenty of opportunity to have a lawyer and plenty of opportunity to testify and put on witnesses; do anything he wanted to do, and all of these decisions are his own personal choice.'' We see nothing prejudicial in the aforesaid statements. They are borne out by the record which reflects, as the prosecutor stated, that appellant was not compelled to face trial without the assistance of counsel, but chose to act as his own counsel, and that the decision not to testify was his own. This explanation was, in our opinion, within the scope of proper argument to the jury.

■ Appellant next complains of the statement made in the closing argument to the jury, when the deputy district attorney stated: "It may be difficult for you as you watch him and listen to him talk to imagine him back at the time of this murder. As you see him here he is on his best behavior; very calm and very polite. *Probably it is the first time in your life that you have been face to face with a convicted murderer, but that is what he is.*" (Emphasis added.)

With commendable fairness, the attorney general concedes that in this instance, the deputy district attorney went beyond the bounds of permissible argument; that this reference to appellant ". . . was not called for and possibly should not be condoned." Assuming that the prosecutor in the instant case went beyond the bounds of legitimate argument in his reference to appellant's prior conviction, we are persuaded that it does not follow that a reversal is required on that ground because the evidence before the jury established the fact that he had previously been convicted of murder and was serving a term of imprisonment therefor. And, from an examination of the record, we are convinced that the evidence of appellant's guilt was so strong that there is no room for indulging in a reasonable probability, that in the absence of the claimed misconduct, a different verdict would have ensued (*People* v. *Wein,* 50 Cal.2d 383, 396, 397 [326 P.2d 457]).

■ Appellant next predicates error upon and charges the prosecutor with misconduct in failing to give appellant a copy of the instructions to be given the jury. The record shows that when both sides had rested, and prior to oral argument, the court stated, "Do you want to have a conference?" to which the deputy district attorney replied, "Yes, I think we probably should on the instructions." Thereupon, such conference between the judge, appellant and the district attorney was held in chambers in the absence of the jury. The court inquired as to whether the prosecutor had given appellant a copy of the proposed instructions, to which the latter replied, "No, I didn't give him a copy of them. Actually, I think we can go through them and probably explain them better than he could by reading them." The court then stated, "For Mr. Williams' (appellant) information I will let him look at these while we are talking about them. The first ones are routine instructions." There then ensued a discussion regarding the import and meaning of the proposed instructions, in which appellant participated. At one time

the court said, "At this point, before we discuss that, maybe we should give him a chance to look at these instructions, and if you have any questions you can ask and we will discuss the question of what instruction should be given, first or second degree murder.

"If you have any questions at all, Mr. Williams, about those, we will be happy to discuss them with you," to which appellant said, "I am satisfied the way it is." While appellant was not furnished a copy of the instructions, he read them over, was invited to, and did challenge the propriety of some of them, and all of them were explained to appellant by the trial judge. We perceive no prejudice to appellant from the conduct of either the judge or the deputy district attorney.

It is further urged by appellant that he was "deprived of due process of law by court's statement as to conduct of trial by defendant." This claim is based on what occurred in the early part of the trial and during a discussion in chambers outside the presence of the jury, and which concerned the admissibility of a letter purportedly written by appellant in which he confessed to another murder (the one for which he was serving time at Folsom State Prison at the time he was placed on trial in the instant case). When the chambers conference adjourned, the trial judge said to appellant, "Incidentally, Mr. Williams, while you are here let me congratulate you on the way you have conducted the case so far. You have done very well. You have done as well as some attorneys I have seen." We are not impressed with appellant's claim that this casual remark of the trial judge was intended to or did lull appellant into a sense of security as to the manner in which he was conducting his case and thereby influenced him not to ask for the appointment of counsel. Since appellant was given every opportunity to avail himself of court-appointed counsel, had he, at this point, requested appointment of counsel, a denial of such request would not be deemed an abuse of discretion (*In re Connor, supra,* 16 Cal.2d 701, 709).

Appellant further insists that he was denied his constitutional right to be represented by counsel because the court did not "Hold a formal waiver of attorney proceeding for the purpose of making a formal determination on the record. . . ." In support of this claim appellant cites the case of *People* v. *Chesser, supra,* 29 Cal.2d 815, 822. We do not regard the cited case as supporting appellant's contention. It does not say that the court must hold a "Formal Waiver of

Attorney Proceeding.'' The case simply reiterates the holding we have announced in the case at bar, that in order to determine whether the accused has exercised a competent and intelligent waiver of counsel, the trial judge must primarily ascertain whether the defendant ''clearly understands the nature and effect of his waiver'' (p. 822). There is no holding that in order to achieve this purpose a formal hearing must be instituted by the court before permitting defense in propria persona (See also *People* v. *Simon*, 107 Cal.App.2d 105, 118 [236 P.2d 855]).

Finally, appellant challenges the correctness of and predicates prejudicial error on the ruling of the court admitting into evidence certain records of the office of the Coroner of Los Angeles County concerning the victim in this case, Ralph H. Burgess. The autopsy with which we are here concerned was performed November 20, 1955, by Dr. Lester Adelson, Chief Deputy Coroner. At the trial it was shown that Dr. Adelson had resigned his position in the Los Angeles coroner's office and was at the time of trial, associated with the coroner's office of Cuyahoga County, Cleveland, Ohio. At the trial of the case at bar, Dr. Frederick D. Newbarr, Assistant Chief Deputy Medical Examiner, in the office of the Coroner of Los Angeles County, testified in lieu of Dr. Adelson. Dr. Newbarr brought with him the original records, which he testified were taken from the official records of the Los Angeles County Coroner's Office concerning the death of the victim, Ralph H. Burgess. Dr. Newbarr testified to the procedures in connection with an autopsy which form the basis for the records of the office. He testified as to the custody of such records. That from the notes made by the autopsy surgeon, a final draft is made by ''one of the medical stenographers,'' which ''must be proofread by the autopsy surgeon, and signed. Then it is filed.'' Dr. Newbarr testified that these records are kept in the regular course of business of the coroner's office. Thereupon, the prosecutor showed two photographs to the witness, Dr. Newbarr, depicting a face and rear view of a man's head and asked him if he could testify that they were photographs of the person upon whom the autopsy was performed, to wit, Ralph Hector Burgess. Dr. Newbarr testified that the case number appearing thereon was identical and that the external trauma which is described in the protocol (a record in the coroner's office) corresponds with the trauma on the face of the individual in the photo-

graphs and therefore it was Ralph Hector Burgess. He further testified that these photographs were a part of the official record. Then he read the report to the jury, excluding the examiner's opinion as to the cause of death.

It is the contention of appellant "that certain photographs of deceased were hearsay" but over his objection, "were received in evidence as business records without foundation." That such photographs, "were not business records within the meaning of Section 1953f, C.C.P."

Appellant relies heavily upon the case of *People* v. *Terrell,* 138 Cal.App.2d 35, 57, 58 [291 P.2d 155], wherein it was held that "an opinion is not one of the matters the record of which may be received in evidence under section 1953f, Code of Civil Procedure. In order for a record to be competent evidence under that section it must be a record of an act, condition or event; a conclusion is neither an act, condition or event; it may or may not be based upon conditions, acts or events observed by the person drawing the conclusion; it may or may not be founded upon sound reason; the person who has formed the conclusion recorded may or may not be qualified to form it and testify to it. Whether the conclusion is based upon observation of an act, condition or event or upon sound reason or *whether the person forming it is qualified to form it and testify to it can only be established by the examination of that party under oath."* (Emphasis added.)

Appellant asserts that Dr. Newbarr improperly read into evidence from the coroner's report, various medical conclusions of Dr. Adelson, who performed the autopsy such as "Entrance wound: There is an entrance type gunshot wound in the left occiput"; "Path of the bullet: After perforating the skin and subcutaneous tissue, the bullet traversed the soft tissue . . .", and "Course of the missile: The bullet passed from posterior to anterior."

It is true as urged by appellant that in the *Terrell* case, *supra,* the court held that the conclusion of a doctor other than the witness could not be introduced into evidence under section 1953f of the Code of Civil Procedure. However, in the *Terrell* case, the court was concerned with the records of a hospital, while here we are confronted with a *public record*—the autopsy report.

An autopsy report is a record that the coroner is required to keep (Gov. Code, § 27491) and is therefore, a public record (*Walker* v. *Superior Court,* 155 Cal.App.2d 134, 138, 139 [317 P.2d 130]; *Schindler* v. *Superior Court,*

161 Cal.App.2d 513, 520 [327 P.2d 68]). Section 1918, subdivision 6 of the Code of Civil Procedure provides that the contents of an official document may be proved by the introduction of the original, while section 1920 of the Code of Civil Procedure provides that entries in public or other official books or records, made in the performance of his duty by a public officer of this state, or by another person in the performance of a duty specially enjoined by law, are prima facie evidence of the facts stated therein.

We are satisfied from a reading of the testimony of Dr. Newbarr, that the same did not constitute opinions and conclusions such as those with which the court was concerned in *People* v. *Terrell, supra*. In the instant case, the witness was testifying from public records kept by the coroner in compliance with section 27491 of the Government Code and which were therefore prima facie evidence of the facts stated therein (Code Civ. Proc., §§ 1918, 1920; *People* v. *Purcell*, 22 Cal.App.2d 126, 129, 130 [70 P.2d 706]).

Furthermore, the sole and only purpose served by the records in the trial was to establish the cause of death. Appellant certainly was not prejudiced by this testimony because neither at the trial nor here, does he seriously challenge the fact that the life of the deceased was terminated by a gunshot wound. Appellant's contention is that he did not participate in the robbery or initiate the cause of the victim's death. Manifestly, it cannot reasonably be contended that testimony and records as to the cause of death of the robbery victim could have so prejudiced the jury that, had it been excluded, a result more favorable to appellant would have been arrived at by the jury. The burden rests upon an appellant to show not only error, but that such error operated to prejudice his substantial rights, militated against his receiving a fair trial, and resulted in a miscarriage of justice (Cal. Const., art. VI, § 4½; *People* v. *Massey*, 151 Cal.App.2d 623, 649 [312 P.2d 365]). No such showing is made here.

For the foregoing reasons, the ineffectual attempted appeals from the sentence, and the order denying right to counsel are dismissed. The judgment is affirmed.

Appellant's petition for a hearing by the Supreme Court was denied December 2, 1959. White, J., did not participate therein.